GEORGE W. COOPER, III, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cooper v. Commissioner
Docket No. 1187-87.
United States Tax Court
T.C. Memo 1992-340; 1992 Tax Ct. Memo LEXIS 363; 63 T.C.M. (CCH) 3138; June 15, 1992, Filed *363 Decision will be entered under Rule 155. B.W. Enlow, for petitioner. Roslyn D. Grand, for respondent. GERBER
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined the following deficiencies in petitioner's Federal income tax and additions to tax: Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6661
1981
$ 173,679 $ 8,684      [1]     --     1982
136,765 6,838      [1]     $ 34,191   1983
135,610 6,781      [1]     33,903   1984
55,177 2,759      [1]     13,794   All section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. The issues for decision are: (1) Whether petitioner had unreported taxable income from sales of counterfeit audio cassette tapes for 1981, 1982, 1983, and 1984; (2) whether petitioner incurred deductible losses *364 from commodities trading for 1982; (3) whether petitioner is liable for self-employment tax for 1981, 1982, 1983, and 1984; (4) whether petitioner is liable for additions to tax for negligence or intentional disregard of rules and regulations under section 6653(a)(1) and (2) for 1981, 1982, 1983 and 1984; and (5) whether petitioner is liable for additions to tax for substantial understatement of Federal income tax under section 6661 for 1982, 1983, and 1984. FINDINGS OF FACT Some of the facts have been stipulated and the stipulation of facts and attached exhibits are incorporated by this reference. At the time of filing the petition herein, petitioner George W. Cooper III resided in Atlanta, Georgia. Petitioner and his wife jointly filed their individual Federal income tax returns for 1981 and 1982. Petitioner and his wife were divorced in 1983. [1] Petitioner filed individual Federal income tax returns for 1983 and 1984. *365 During the period from 1981 through August 1984, petitioner was engaged in the business of manufacturing and selling counterfeit audio cassette tapes of the music and songs of various popular recording artists. These cassette tapes were virtually indistinguishable in appearance, packaging, and sound quality from the legitimate, duly licensed, and commercially sold tapes of these recording artists. Petitioner did not pay any royalties on the tapes he produced to the recording artists or to the recording companies which owned the rights to exploit the artists' music or songs. During 1981 through August 1984, petitioner also sold legitimate tapes and recording supplies. Petitioner had sold legitimate tapes and recording supplies since the early 1970's. He had begun manufacturing and selling counterfeit tapes at least by 1977. These counterfeit tapes included 8-track tapes. However, by 1981 petitioner concentrated on producing only the smaller sized cassette tapes. Prior to August 1984, petitioner lived with his parents in Piedmont, South Carolina. Petitioner's father, George W. Cooper II, was a party in a prior case before this Court. See . *366 During the period from 1981 through August 1984, petitioner conducted some of his business operations under the name Palmetto State Enterprises (Palmetto). Petitioner maintained a bank account in Palmetto's name. He deposited some of the money from counterfeit tape sales into the account. Petitioner utilized this account to pay for supplies and equipment for both his legitimate and counterfeit tape activities. Petitioner conducted his business operations from various locations. He stored equipment and supplies for manufacturing counterfeit tapes at or near his parents' residence. Petitioner also manufactured counterfeit tapes at the homes of the individuals he hired to assist him in producing tapes. Petitioner also maintained inventories of counterfeit cassette tapes stored in boxes, each containing 50 cassettes, in a warehouse. During 1981 through August 1984, petitioner employed at least three to four individuals on a full-time basis to produce the tapes. One of these individuals was petitioner's cousin, William Ronald Stone (Ronnie Stone). Ronnie Stone held no other employment during this period. Potential customers typically telephoned petitioner, advised him of the *367 specific types and quantities of cassette tapes they sought to purchase, and arranged to meet with petitioner. Petitioner often brought customers to his warehouse to let them select the tapes they desired. Petitioner was paid in cash for the counterfeit tapes. During 1981 through August 1984, petitioner generally sold his counterfeit cassette tapes at an average price of $ 1.25 per cassette. In contrast, legitimate tapes were generally sold for a wholesale price of between $ 3 to $ 4 per cassette. On occasion petitioner sold from inventory, at a discount, specific tapes which were not in high demand. Petitioner also, on occasion, refunded the money paid to him when certain counterfeit tapes were found to be defective. Petitioner's customers resold the counterfeit tapes in at least 12 southern States. These counterfeit tapes were often resold at a retail price of either $ 3 per cassette or two cassettes for $ 5. During 1981 through 1984, petitioner owned loading, packaging, printing, and recording equipment to manufacture counterfeit tapes. Petitioner utilized at least one master recording device, 10 high-speed recording devices called slaves, and 5 loading devices. Petitioner *368 used his printing equipment to copy and reproduce the labels used on legitimate tapes. To produce a counterfeit tape, petitioner first purchased a legitimate cassette or record from which he then created a master recording. The master recording was then set to run on a continuous loop and connected to a slave. The slave could be operated to record the material on the master recording at a high speed. Typically, either 5 or 10 slaves were connected and operated to produce copies of the master recording. A roll of recording tape, for example an 8,400-foot roll, would be fed to each slave. During the recording process, other monitoring equipment inserted cue tones onto the recording tape each time a copy of the master recording was completed by the slave. The completed roll of tape is known as a pancake. Utilizing loading equipment, the copies on the pancake were then loaded onto the plastic cassette shells. Once the tape was spliced and wound onto the individual cassette, labels were printed directly onto the cassette, and the cassette was packed in a clear plastic box with another folded pictorial label or sleeve. The finished, boxed cassette was then wrapped and sealed in *369 a clear plastic wrapper. With the equipment he owned, petitioner and his employees were capable of manufacturing and producing an average of 10,000 counterfeit cassette tapes a week. In 1979, law enforcement authorities raided a location at which petitioner was manufacturing counterfeit tapes and seized his tape-producing equipment. Petitioner was convicted of copyright infringement in 1980. In May 1981, petitioner was convicted of racketeering, conspiracy, and copyright infringement, and sentenced to 9 years in prison. Pending appeal of his 1981 conviction petitioner remained free until August 1984. After his tape production equipment was seized in 1979, petitioner continued to carry on his counterfeit tape activities with newly acquired tape production equipment. He also acquired radio equipment which allowed him to monitor the radio communications of law enforcement officers. In an effort to evade law enforcement authorities petitioner moved his counterfeit tape manufacturing operations on a number of occasions. After the 1979 raid, neither the Recording Industry Association of America nor law enforcement authorities were successful in discovering the new manufacturing *370 locations. In August 1984, petitioner was convicted on 1 conspiracy charge and 11 copyright infringement charges receiving a sentence of 12 years in prison, which was to run concurrently with his 9-year sentence under his 1981 conviction. Petitioner began serving his sentence in August 1984, and was released from prison in August 1989. Immediately prior to beginning his prison sentence, petitioner instructed his cousin Ronnie Stone and Sandra Stone (Ronnie Stone's wife) to continue petitioner's counterfeit tape business while petitioner was in prison. Petitioner gave Sandra Stone a notebook containing the names and telephone numbers of some of petitioner's customers, as well as the names and telephone numbers of suppliers of the equipment, parts, services, and supplies needed for manufacturing the tapes. Petitioner told Sandra Stone the notebook contained all the information needed to continue petitioner's business. Petitioner instructed Ronnie and Sandra Stone to turn over the profits earned from the business to petitioner's parents. The notebook given to Sandra Stone contained the names of six customers, each of whom was described as being a "Buyer 1.25". Among the suppliers *371 listed in the notebook was a New Jersey supplier from whom petitioner indicated the plastic boxes for cassettes could be ordered at $ .06 per box. The notebook also listed a supplier in Greenville, South Carolina, from whom petitioner indicated small boxes could be ordered for about $ .20 each. Petitioner further indicated that the small boxes should be ordered from this supplier in quantities of either 3,000, 4,000, or 5,000 per shipment, cash on delivery. Over a 3-month period from August through October 1984, Sandra Stone recorded entries in the notebook which reflected that she and her husband had sold or delivered 51,800 cassettes to four customers. Most, if not all, of the 51,800 cassettes were sold for $ 1.25 per cassette. Subsequently, petitioner had a disagreement with Ronnie and Sandra Stone. As a result, petitioner in November 1984 informed a Federal Bureau of Investigation (FBI) agent that in return for a favorable recommendation concerning a reduction in petitioner's sentence, petitioner would furnish information on a counterfeit tape manufacturing operation conducted by Ronnie and Sandra Stone. Petitioner furnished the FBI agent with detailed information concerning *372 the alleged counterfeit tape manufacturing operation conducted at Ronnie and Sandra Stone's Piedmont, South Carolina, residence. The FBI agent obtained a warrant and conducted a search of Ronnie and Sandra Stone's residence, but did not discover any counterfeit tape manufacturing equipment. The notebook petitioner had given to Sandra Stone, however, was found during the search. The FBI agent informed petitioner that the search conducted of the Stones' residence had been unsuccessful. Petitioner advised the agent that petitioner, through petitioner's father, would turn over all other equipment that had been used by petitioner in manufacturing counterfeit 8-track tapes and counterfeit cassette tapes. In April and May 1985, petitioner's father executed documents under which petitioner relinquished ownership of certain tape-producing equipment which allegedly had been used by Ronnie and Sandra Stone in manufacturing counterfeit tapes at their residence from 1980 until the summer of 1984. The documents recited that petitioner was the owner of the equipment and that petitioner's father was turning over the equipment to the FBI agent at petitioner's request. The equipment listed included *373 2 master recording devices, 11 slaves, 4 loading devices, and other packaging equipment. Some of the equipment was for manufacturing 8-track tapes instead of cassette tapes. On his 1981, 1982, 1983, and 1984 Federal income tax returns, petitioner reported the following items of taxable income: 1981
1982
1983
1984
Business income
$ 15,731
$ 16,419
$ 27,202
$  7,805
Capital gain
1,240
-- 4,800
3,280
Total taxable income
16,971
16,419
32,002
11,085
On a Schedule C -- Profit (or Loss) from Business or Profession, attached to his respective returns, petitioner computed his business income as follows: 1981
1982
1983
1984
Gross receipts or sales
$ 236,553
$ 204,608
$ 215,344
$ 92,732
Cost of goods sold
219,822
187,189
187,117
84,927
Gross profit
16,731
17,419
28,227
7,805
Deductions
1,000
1,000
1,025
-- Net profit
$  15,731
$ 16,419
$ 27,202
$ 7,805
Petitioner employed an accounting firm to prepare his returns. Respondent issued notices of deficiency to petitioner for 1981, 1982, 1983, and 1984. The notices of deficiency for 1981 and 1982 contained the following explanations of petitioner's unreported income as *374 determined by respondent: a. During the taxable years 1981 and 1982, the gross receipts from the sale of counterfeit audio cassette tapes are $ 650,000.00 in 1981 and $ 650,000.00 in 1982 instead of the $ 236,553.00 and $ 204,608.00 reported on your 1981 and 1982 returns respectively. Accordingly, your taxable income is increased $ 413,447.00 and $ 445,392.00 for the years 1981 and 1982 respectively. See computation below: Audio cassettes produced per week
10,000
Weeks per year
52
Yearly production of cassettes
520,000
Sales price per cassette
$    1.25
Gross receipts for year
$ 650,000
b. The deductions of $ 219,822.00 and $ 187,189.00 shown on your 1981 and 1982 returns as cost of goods sold are increased by $ 128,578.00 and $ 161,211.00 respectively because your cost of sales are determined to be $ 348,400.00 and $ 348,400.00 for the years 1981 and 1982 respectively. Accordingly, your taxable income is decreased $ 128,578.00 and $ 161,211.00 for 1981 and 1982 respectively. See computation below: Yearly production of cassettes
520,000
Cost per cassett
[1] $     .67
Cost of sales for year
$ 348,400
*375 c. During the year 1982 the dividends of $ 472.00 that you received from Paine, Webber, Jackson, Curtis, Incorporated are not reported on your income tax return. Accordingly, your taxable income for 1982 is increased $ 472.00 In the notices of deficiency for 1983 and 1984, respondent determined petitioner's unreported taxable income for 1983 and 1984 from counterfeit audio cassette sales in the same fashion as for 1981 and 1982, except that for 1984 respondent determined that petitioner had operated for 22 weeks and had produced and sold only 220,000 cassettes. Respondent determined that petitioner for 1983 and 1984 had $ 650,000 and $ 275,000, respectively, in gross receipts from the sale of counterfeit cassette tapes. Petitioner contends that the gross receipts and taxable income which he reported on his returns for 1981, 1982, 1983, and 1984 are substantially correct. Petitioner alleges that he relied upon his books and records in determining his tax liabilities. In his petition, he further alleges: r. The selling price of the audio cassettes was not constant, but varied from zero for sample and some out-of-date tapes to $ 1.25 for some current tapes, but many current *376 tapes sold for less than $ 1.25, as shown by my books and records; s. The average cost of producing an audio cassette should be figured as follows: Blank tape
$ .21
Cartridge
.19
Duplication (including depreciation)
.10
Label
.15
Labor
.15
Box
.07
Splice
.01
Shrink wrap
.01
Waste
.08
Cardboard box
.01
Production cost per cassette
.98
t. In 1982, I did receive dividend income of $ 472.00; however, I incurred losses of more than $ 472.00 in the same commodities account; u. The Commissioner has arbitrarily and capriciously created and assumed a figure of 10,000 audio cassettes per week for 178 consecutive weeks, having no basis in fact to make such an assumption and no reason to draw such an inference, and such figure is incorrect and grossly overstates the number of audio cassettes actually produced, the actual figure differing from year to year and being accurately reflected in my books and records. ULTIMATE FINDINGS OF FACT Petitioner produced and sold an average of 9,000 tapes a week at a cost of $ .77 per cassette. Petitioner sold his tapes at an average price of $ 1.25 per cassette. OPINION Unreported Income from Tape Sales
Where a taxpayer *377 fails to maintain or produce adequate records, respondent is authorized by section 446 to compute the taxpayer's taxable income by any method which, in respondent's opinion, clearly reflects income. . Respondent has great latitude in selecting a method for reconstructing a taxpayer's income and respondent's method need only be reasonable in light of all the surrounding circumstances. As the Fifth Circuit Court of Appeals observed in : Arithmetic precision was originally and exclusively in * * * [the taxpayer's] hands, and he had a statutory duty to provide it. He did not have to add or subtract; rather, he had simply to keep papers and data for others to mathematicize. Having defaulted in his duty, he cannot frustrate * * * [respondent's] reasonable attempts by compelling investigation and recomputation under every means of income determination. * * * Petitioner bears the burden of proof and must establish that respondent's determinations are erroneous. Rule 142(a); . *378 Petitioner, despite alleging that his books and records would substantiate the gross receipts, cost of goods sold, and taxable income reported on his returns, failed to introduce into evidence any such business records. Petitioner concedes that during the years in issue he was engaged in the business of manufacturing and selling counterfeit cassette tapes; however, he argues that respondent's estimates of his unreported taxable income are too high. Petitioner disputes the following aspects of respondent's determinations: (1) The number of tapes sold by petitioner for each year in issue, (2) the price at which the tapes were sold, and (3) petitioner's cost of goods sold. Petitioner further contends that any unreported income otherwise earned by petitioner from the counterfeit tape business should be reduced by the unreported taxable income petitioner's father was held to have for 1981, 1982, 1983, and 1984 in . The evidence of record, although conflicting concerning the annual amounts of taxable income earned, establishes that petitioner greatly understated his taxable income from his illegal counterfeit tape business. *379 While petitioner testified that he produced and sold an average of only 3,000 tapes a week, he presented no evidence at trial supporting that figure. Assuming that the 3,000 tapes a week sold for an average price of a $ 1.25 per cassette and accepting the cost of goods sold was the $ .98 per cassette alleged by petitioner, petitioner would have annual gross receipts or sales of $ 195,000 and have earned an annual profit of $ 42,120. Despite his prior criminal convictions in 1979 and 1980 and the fact that he was aware of the surveillance efforts being mounted against him by the Recording Industry Association of America and law enforcement authorities, petitioner during the years in issue continued to carry on his illicit counterfeit operations. In August 1984, although he was shortly to begin a 12-year prison sentence, petitioner wanted his cousin Ronnie and Sandra Stone to continue to operate petitioner's highly profitable business. Indeed, in a credit application dated May 8, 1980, petitioner stated that Palmetto's tape distribution business had estimated annual sales of $ 500,000. We are convinced that petitioner earned more than $ 42,120 a year from his counterfeit tape *380 business. We further note that in the notebook given to Sandra Stone, petitioner listed a supplier of small boxes. Petitioner utilized boxes containing 50 cassettes. In the notebook, petitioner indicated that shipments of either 3,000, 4,000 or 5,000 boxes should be ordered from the supplier. Assuming that each of these boxes held 50 cassettes, a single shipment of the boxes could be used to hold either 150,000, 200,000 or 250,000 cassettes. The fact that petitioner recommended ordering in such quantities indicates that petitioner's average weekly production exceeded 3,000 cassettes. At trial, the revenue agent who examined petitioner's returns testified that in estimating petitioner's unreported sales income from tapes, he consulted with an executive in charge of production for a large recording company. Based on the furnished information the agent, assuming a 40-hour work week and allowing for equipment breakdowns, estimated petitioner produced and sold an average of 10,000 tapes a week. Ronnie Stone testified that petitioner produced as many as 20,000 tapes a week during the years in issue. He related that initially petitioner's average weekly production was 10,000 tapes. *381 He stated that later petitioner's average weekly production increased to 20,000 tapes. We perceived both Ronnie and Sandra Stone to be hostile to petitioner in light of petitioner's efforts to have them arrested by the FBI. We, therefore, do not totally accept Ronnie and Sandra Stone's testimony concerning petitioner's estimated weekly sales of counterfeit tapes. Respondent also offered the testimony of an investigator from the Recording Industry Association of America. This witness estimated that petitioner was producing and selling 50,000 tapes a week during the years in issue. His estimate was apparently arrived at by extrapolating from the quantities of counterfeit tapes seized from various distributors and vendors, which tapes the witness believed petitioner had produced. This witness explained that petitioner's counterfeit tapes could be identified because the cue tones on petitioner's tapes were louder than those on legitimate tapes and because the packaging equipment petitioner used left a wrinkle in the plastic wrapper in which each cassette was sealed. However, this witness acknowledged that at least three to four other counterfeit tape manufacturers were operating *382 during the years in issue. We are, therefore, skeptical of this witness's claim that petitioner produced and sold 50,000 tapes a week. While we consider the methodology used by respondent to reconstruct petitioner's taxable income to be reasonable under the circumstances, certain adjustments should be made. Petitioner testified his employees worked only 3, 4, or 5 days a week producing his tapes. Ronnie Stone confirmed that he did not work every day, although he would when necessary work for as long as 10 or 12 hours per day. Sandra Stone stated that petitioner's tape manufacturing operations were moved "dozens and dozens of times" during the years in issue. Ronnie and Sandra Stone testified that when petitioner's tape manufacturing operations were moved, it would generally take a few days before petitioner could resume manufacturing tapes. We have found that petitioner produced and sold an average of 9,000 tapes a week. In determining that petitioner sold 9,000 tapes a week, we have also taken into account equipment breakdowns and other production problems. We have also made allowances for the fact that petitioner would occasionally sell particular tapes at a discount and *383 would make refunds on defective tapes. We have also considered petitioner's claim that he may have given small numbers of free sample tapes to customers and, at times, burned or discarded certain unsold finished tapes. As to the average price for which the tapes were sold, petitioner acknowledged that he occasionally sold tapes for $ 1.25 per cassette. Sandra Stone testified that petitioner sold his cassettes for an average price of $ 1.25 per cassette. She related that while petitioner's bigger customers may have paid a little less, other customers paid as much as $ 1.50 per cassette. In the notebook given to Sandra Stone, petitioner listed six customers as being a "Buyer 1.25". Further, during a 3-month period beginning in August 1984, most, if not all, of the 51,800 tapes Ronnie and Sandra Stone sold were sold for $ 1.25 per cassette. We have found that petitioner sold 9,000 tapes a week at an average price of $ 1.25 per cassette. As to petitioner's cost of goods sold, petitioner, although disputing respondent's $ .67 per cassette figure, listed in his petition identical costs for a number of the items upon which respondent based her cost figure estimate. Petitioner failed *384 to offer any records substantiating the higher $ .98 per cassette figure alleged in his petition. Petitioner testified that he paid Ronnie and Sandra Stone $ .15 for each cassette they produced, rather than on the hourly basis the Stones claimed, and that he generally paid the persons who worked for him in cash. It is plausible that the Stones were paid on the basis of the cassettes they produced for petitioner, although they may not have received as much as the $ .15 per cassette petitioner claimed. Ronnie and Sandra Stone apparently supported their family only on what they earned from working for petitioner, as neither held any other employment during the years in issue. In the notebook given Sandra Stone, petitioner also indicated that the plastic boxes used for his cassettes could be ordered for $ .06 a box. We have found that petitioner's cost of goods sold was $ .77 per cassette. In arriving at this $ .77 per cassette figure, we have taken into account various items for which respondent may have estimated too low a cost. We further conclude that no reduction to petitioner's taxable income from cassette sales should be made for the unreported taxable income which petitioner's *385 father was held to have for 1981, 1982, 1983, and 1984 under this Court's prior decision in . In that case, respondent reconstructed the income of petitioner's father utilizing the source and applications method. In that opinion, it was noted that there was strong evidence that petitioner's father was involved in petitioner's business. We, however, sustained respondent's determination based on the father's failure to meet his burden of proof. The parties have stipulated into evidence a copy of the trial transcript in that case. Petitioner and his father, in their testimony, both denied that petitioner's father was involved or held any interest in petitioner's counterfeit tape business. Similarly, at trial in the present case petitioner again testified that his father did not have any interest or receive any share of the profits from petitioners' business. On this record we have no basis for attributing to petitioner's father any portion of the unreported income earned by petitioner during the years in issue. Claimed Loss Deductions from Commodities Trading
Petitioner concedes that he had $ 472 of unreported *386 dividend income for 1982, but alleges that he had offsetting loss deductions from commodities trading. Petitioner bears the burden of proof. Rule 142(a). Petitioner failed to offer any evidence concerning the alleged offsetting deductions. We sustain respondent's determination that petitioner had $ 472 of unreported dividend income for 1982. Self-Employment Tax
Subsections (a) and (b) of section 1401 impose taxes on the self-employment income of every individual. Self-employment income means "net earnings from self-employment" not in excess of a specified ceiling amount. Sec. 1402(b). Net earnings means "the gross income derived by an individual from any trade or business carried on by such individual," less the allowable deductions pertaining to such trade or business. Sec. 1402(a). Respondent determined that petitioner was liable for self-employment taxes for 1981, 1982, 1983 and 1984. Petitioner conceded that during the period from 1981 through August 1984, he was engaged in the business of manufacturing and selling counterfeit tapes. We conclude that petitioner is liable for self-employment tax on the business taxable income we have determined him to have for *387 1981, 1982, 1983, and 1984. Additions to Tax
Section 6653(a)(1) provides for a 5-percent addition to tax when any part of the underpayment was due to the taxpayer's negligence or intentional disregard of rules and regulations. Section 6653(a)(2) provides for an addition to tax equal to 50 percent of the interest on the portion of the underpayment attributable to negligence or intentional disregard of rules and regulations. Petitioner bears the burden of proving respondent's determination is in error. Rule 142(a). Petitioner has failed to carry his burden. Moreover, petitioner's failure to maintain adequate books and records, coupled with his omissions of income for each year, further supports a finding of negligence. See, e.g., . Accordingly, we find that petitioner is liable for additions to tax under section 6653(a)(1) and (2) for 1981, 1982, 1983, and 1984 based on the entire underpayment. Section 6661 provides for an addition to tax for substantial understatement, equal to 25 percent of the amount of any underpayment attributable to such understatement for the taxable year. To be considered substantial, *388 the understatement must exceed the greater of $ 5,000 or 10 percent of the tax required to be shown on the return. Sec. 6661(b)(1)(A). The amount of the understatement is reduced by the portion of the understatement attributable to any non-tax-shelter item for which there was either substantial authority for the taxpayer's return position or adequate disclosure in the return. Sec. 6661(b)(2)(B). Petitioner understated his tax for 1982, 1983, and 1984, and the respective understatements were substantial. He has not asserted that the understatements should be reduced under section 6661(b)(2)(B). We find that petitioner is liable for additions to tax under section 6661 for 1982, 1983, and 1984. Decision will be entered under Rule 155. Footnotes
1. 50 percent of the interest due on the deficiency.↩
1. Respondent did not issue a notice of deficiency to petitioner's wife for 1981 and 1982, and she is not a party in this case.↩
1. Cost per cassette figured as follows: ↩
$ .21
Blank tape
.19
Cartridge
.10
Duplication (includes depreciation)
.05
Label
.05
Labor
.05
Cardboard sleeve (Box)
.01
Splice
.01
Shrink wrap
$ .67
Production cost per cassette